# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# CENTRAL DIVISION

**DALON V. RODGERS**  **PLAINTIFF**
**ADC #164397**

v.                           No: 4:21-cv-00174-PSH

**CHARLES ALLEN, *et al.*** **DEFENDANTS**

## MEMORANDUM AND ORDER

### I. Introduction

Plaintiff Dalon V. Rodgers filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 on March 3, 2021, while incarcerated at the Pulaski County Detention Facility ("PCDF") (Doc. No. 2).[1] He subsequently filed an amended complaint (Doc. No. 8), which was served on Defendants Lieutenant Charles Allen, Deputy Terri Reed, and Lieutenant Nicole Nelson (the "Defendants"). *See* Doc. No. 11. Rodgers alleged that on February 1, 2021, Allen used excessive force on him by tightening his handcuffs to the point where he began bleeding despite his compliance with Allen's orders. Doc. No. 8 at 4. Rodgers further alleges that Allen instructed Nelson and Reed to hold his arms steady while Allen continued to tighten his right handcuff and that Nelson and Reed did so. *Id.* at 4-5. He claims that Allen continued twisting

---

[1] Rodgers is currently incarcerated at the Arkansas Division of Correction's Grimes Unit. *See* Doc. No. 9.

his cuffs for 7-8 minutes while Nelson and Reed held him down. *Id.* at 5. Rodgers claims the handcuffing incident left him with visible cuts resulting in permanent scars and numbness. *Id.*

Defendants filed a motion for summary judgment, a brief in support, and a statement of facts asserting that they are entitled to judgment as a matter of law on the merits of Rodgers' claims (Doc. Nos. 27-29). Although Rodgers was notified of his opportunity to file a response, he did not do so. *See* Doc. No. 32. He also failed to file a statement setting forth disputed facts he believes must be decided at trial as required by Local Rule 56.1. Because Rodgers failed to controvert the facts set forth in the Defendants' statement of facts, Doc. No. 29, those facts are deemed admitted. *See* Local Rule 56.1(c). The Defendants' statement of facts, and the other pleadings and exhibits in the record, establish that the material facts are not in dispute, and Defendants are entitled to judgment as a matter of law.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir.

2002). The nonmoving party may not rely on allegations or denials, and must instead demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted).

An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". Fed. R. Civ. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

In *Reed v. City of St. Charles, Mo.*, 561 F.3d 788 (8th Cir. 2009), the Eighth Circuit Court of Appeals discussed the requirement that facts be viewed in the light most favorable to the nonmoving party when considering a motion for summary judgment. The Court stated, "[i]f 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Id.* at 790 (*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### III.  Facts[2]

On or about September 3, 2020, Plaintiff, Dalon V. Rodgers, was booked into the PCDF on multiple charges, including a six-month parole revocation. Doc. No. 29-2, *Rodgers' Arrest and Booking*, at 1.

### *The Handcuffing Incident*

Rodgers alleges that Defendants exercised excessive force against him because Allen tightened his handcuffs while Reed and Nelson held him down during an incident that occurred on February 1, 2021. Doc. No. 8 at 4-5. PCDF records and body camera footage show the incident at issue actually occurred on January 29,

---

[2] These facts are taken from the Defendants' statements of facts (Doc. No. 29), and the documents and records attached, including relevant video of the incident in question.

2021.  Doc. No. 29-5, *January 29, 2021 Incident Report*.  Rodgers also grieved the incident that day.  Doc. No. 29-3, *Standard Grievance*.  The incident report prepared by defendant Deputy Terri Reed states as follows:

> At approximately 0345, Inmate Rodgers, Dalon (#09801-20) began banging on his glass, demanding to see a sergeant. When I told him the sergeant was on the way, he said "Fuck the sergeant, get a nurse down here." I then asked him what was wrong and he said he was having trouble breathing. At 0358, Nurse Millikan and Sergeant D. Bilbruck came to see Inmate Rodgers. While the nurse was trying to assess him, he became angry and refused to "cuff up" (submit to restraints). He then requested the Lieutenant. Sergeant Bilbruck told him he doesn't get to see the lieutenant just because he wants to. Inmate Rodgers held down his food trap and wouldnt' [sic] allow us to close it. Sergeant Bilbruck secured the sub day room door and then left the unit. Soon after he left, Inmate Rodgers popped out of his cell, I then radioed for a supervisor. Lieutenant Nelson, Lieutenant Allen, Sergeant Bilbruck, Sergeant Evans, Deputy Buckner, Deputy Goshen, Deputy McCann and Nurses Millikan and Jackson came into the unit. Inmate Rodgers was then placed in handcuffs. He then began to threaten Lieutenant Allen. Inmate Rodger's room was searched because there was the smell of marijuana. His commissary was taken and items of contraband were found in his room. He had 2 pills, extra sheets, extra blankets, a torn sheet, and trash. Inmate Rodgers room was also cleaned. He was then strip searched. The cell door was secured, the restraints were removed, and the food trap secured without further incident.

Doc. No. 29-5.  Rodgers' grievance states:

> On 1-29-21 At approximately 4:15 a.m Lt. C. Allen responded to T Unit where I am currently being held due to me popping the cell lock because the Deputy T. Reed working the unit refused to let me clean my cell , Upon Lt. C. Allen arriving in the sub-day T-333 he asked me to cuff up after I cuffed up I was talking to Lt. Nelson about the situation with me [sic] clean my cell while Lt. C. Allen was still holding the handcuff in a tightly manner twisting my wrist. No code blue was called or spray was used and due to the policy if any inmate shows any signs of

aggression that give protcols [sic] to use the OC spray! I would like this incident investigated!

Doc. No. 29-3.

Body camera footage from Axon Body 2 X81468099, Axon Body 2 X81468513, and Axon Body 2 X81465835 shows the following. *See* Doc. No. 29-7, *Video Footage.* Jail officials approached Rodgers while he was outside of his cell and restrained him with handcuffs without resistance at 10:16. At 10:17, defendant Lieutenant Charles Allen led Rodgers to a bench where he sat down. Rodgers claimed he had COVID-19, complained about his cell conditions, and suggested that he wanted his cell to be cleaned. Rodgers stated, "You can let my hands go, I ain't gonna do nothing brother." Allen held Rodgers' handcuffs and responded, "You done popped out your cell brother, that's a whole different." Rodgers responded "alright" and began to argue with jail officials.

Meanwhile, the jail official wearing body camera Axon Body 2 X81468513 left the scene at 10:17 and stated "Rodgers popped out." That jail official returned to the scene at 10:18 with defendant Deputy Terri Reed,[3] who was carrying a broom. Reed and other jail officials cleaned Rodgers' cell and removed items. By 10:19, Rodgers was standing and resisting directions to sit down. During his struggle with officers, the camera Axon Body 2 X8146535 was knocked off the jail official

---

[3] Nelson and Reed can be identified by the names on their uniforms.

wearing it. Allen and another officer[4] held Rodgers' arm while he protested to items being removed from his cell and argued with defendant Lieutenant Nicole Nelson who was standing nearby. The jail official equipped with the body camera Axon Body 2 X81468099 left the scene at 10:20 to get "tether and shackles."

At 10:21, the jail official wearing body camera Axon Body 2 X81468513 exited Rodgers' cell, while Rodgers complained that officers were twisting his wrists. That body camera shows Allen and another jail official holding Rodgers while he is seated in a forward leaning position with his face looking at the ground. Rodgers asked one of the jail officials restraining him "Can you let my wrist go, please sir. Please can you let my wrist go." Allen asked, "Are we done with the threats, Mr. Rodgers?" Rodgers responded, "Yes sir, yes, yes sir." Rodgers was lifted back up by jail officials. Allen stated he smelled marijuana. Rodgers then stated "Can you let my wrist go. Please, bro?" Rodgers continued to be restrained by jail officials and stopped complaining about his wrists. A jail official applied a handcuff tether to Rodgers' handcuffs at 10:22. Allen stated, "I'll help you out the best I can man, always have and I always will, but you ain't gonna threaten me man."

---

[4] This officer appears to be the officer wearing Axon Body 2 X8146535 because he is not seen in that video but appears to be the person holding onto Rodgers. He is identified as Deputy Buckner in Nelson's affidavit. *See* Doc. No. 29-9 at ¶ 3 & 8. At no point did Terri or Nelson restrain or touch Rodgers according to the video footage.

Allen again stated he smelled weed before Rodgers was pulled to a standing position by jail officials. Allen instructed other jail officials to search his cell.

Rodgers was seated again by jail officials at 10:22 while his cell was searched; he is seen a forward leaning position. Rodgers was asked about and offered a Covid test by Nelson multiple times, but he did not respond. He continued to lean over and was instructed to stand up at 10:24, when jail officials led him into his cell. Rodgers continued to be argumentative and was strip searched. Afterwards, he was led to the door of his cell, his restraints were removed, and his cell was locked at 10:28.

Each of the Defendants provided an affidavit describing the handcuffing incident seen in the video footage. In her affidavit, Nelson explained that she arrived at Rodgers' cell on January 29, 2021, because he had manipulated the locking mechanism on his door and let himself out. Doc. No. 29-2 at ¶ 2. Nelson spoke with Rodgers while he was restrained by Allen and Buckner, and then ordered the cleaning and search of his cell. *Id.* at ¶¶ 3-4. She explained that Rodgers became argumentative and combative after she told him his commissary would be taken from his cell. *Id.* at ¶ 5. According to Nelson, Rodgers stood up from the bench he was seated on and refused orders to sit down. *Id.* at ¶¶ 6-7. Nelson explained that Allen and Buckner restrained Rodgers to prevent Rodgers from entering his cell during the search because that would pose a security threat; she stated that force was no longer applied once he became compliant. *Id.* at ¶¶ 8-9. She did not witness Allen use an

excessive amount of force on Rodgers while he was restrained and did not witness any blood or injury to Rodgers' wrists. *Id.* at ¶¶ 10, 15. According to Nelson, Rodgers did not inform her he was injured or needed medical attention for his wrists after the January 29 incident. *Id.* at ¶ 16. She stated she did not have any physical contact with Rodgers and did not hold his arms down. *Id.* at ¶¶ 13-14.

Reed described the same events in her affidavit. Doc. No. 29-10 at ¶¶ 7-8, 10-14. She also had no physical contact with Rodgers and did not hold his arms down. *Id.* at ¶¶ 16-17. Reed likewise did not witness Allen use excessive force on Rodgers and did not observe any blood or injury to Rodgers' wrists. *Id.* at ¶¶ 14 & 18. She also stated that Rodgers did not tell her he was injured or request medical treatment. *Id.* at ¶ 19.

Allen also described the same events in his affidavit. Doc. No. 29-11 at ¶¶ 2-7. He further explained that Rodgers grew increasingly upset when he was told that his commissary would be taken and after Rodgers refused Allen's orders to sit down, Allen attempted to perform a wrist lock on Rodgers to gain control of him. *Id.* at ¶ 5. According to Allen, the wrist lock was unsuccessful so he twisted Rodgers' arms to gain control of him and prevent him from entering his cell while his cell was cleaned and searched. *Id.* Allen stated that once he gained control of Rodgers and Rodgers was seated, he released the pressure on his arms. *Id.* at ¶ 8. Allen stated that he did not further tighten Rodgers' handcuffs during this encounter, as Rodgers

alleged in his complaint. *Id.* at ¶ 9. According to Allen, he used "only the force reasonably necessary to control [Rodgers] and to prevent him from possibly attempting to enter his cell while PCRDF staff members searched it." *Id.* at ¶ 10. Like Nelson and Reed, Allen did not witness any blood on Rodgers' wrists or observe any injury to his wrists, and Rodgers did not inform Allen that he was injured or needed medical attention during the encounter. *Id.* at ¶¶ 12-13.

### *Rodgers' Medical Treatment*

From January 29, 2021, until Rodgers' release to the Arkansas Division of Corrections (ADC) on March 9, 2021,[5] PCDF medical personnel conducted segregation rounds five times. Doc. No. 29-4, *Jail Medical File Information,* at 1-4. Rodgers did not request medical services during those rounds. *Id.* On March 10, 2021, Rodgers was examined by medical personnel at the ADC. Doc. No. 29-8, *ADC Medical Records*, at 2-6. The Initial Report of Physical Examination noted that Rodgers' skin was "Normal," he voiced no complaints, and no restrictions were placed on him. *Id.* From March 10, 2021, – June 25, 2021, Rodgers filed three medical requests. *Id.* at 10, 13 & 27. He did not complain of any injury to his wrists, but complained of dry skin on March 16, 2021, complained of a runny nose, sore

---

[5] Doc. No. 29-2 at 2.

throat, and headache on April 27, 2021, and requested an eye exam on June 4, 2021. *Id.*

## IV. Analysis

### A.     *Individual Capacity Claims*

Defendants argue that they are entitled to qualified immunity with respect to Rodgers' individual capacity claims because he cannot prove they violated his constitutional rights.[6] The Court agrees for the reasons described below.

Rodgers' claims of excessive force are analyzed under the Eighth Amendment's prohibition on cruel and unusual punishment because Rodgers was incarcerated on a parole revocation at the PCDF when the handcuffing incident happened. *See Dodd v. Latimore,* 2018 WL 4346686 at *1 (E.D. Ark. Aug. 30, 2018)*; see also, Moore v. Shock,* 2014 WL 5474613 (E.D. Ark. Oct. 29, 2014).

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force

---

[6] Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015). Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (quoting *Hudson v. McMillian,* 503 U.S. 1, 6–7). *See also Whitley v. Albers*, 475 U.S. 312, 322 (1986) (holding that, in an excessive force case, there must be "a reliable inference of wantonness," and not "a mere dispute over the reasonableness of particular use of force or the existence of arguably superior alternatives"). Factors which inform this inquiry include the need for the application of physical force; the relationship between the need for physical force and the amount of force applied; and the extent of injury suffered by the inmate. *Jones v. Shields*, 207 F.3d at 495. Unless "'it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury.'" *Johnson v. Bi-State Justice Ctr./Arkansas Dep't of Corr.*, 12 F.3d 133, 136 (8th Cir. 1993) (*citing Whitley,* 475 U.S. at 322).

A plaintiff need not allege significant injuries to state an excessive force claim.[7] However, the extent of a plaintiff's injuries may constitute evidence of the

---

[7] *See Wilkins v. Gaddy*, 130 S.Ct. 1175, 1178-79 (2010) (abrogating the *de minimis injury* rule in excessive force cases, and clarifying that the extent of the injury is only one factor to be considered when resolving the "core judicial injury" of "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"); *Williams v. Jackson*, 600 F.3d 1007, 1012 (8th Cir. 2010) (holding that "the extent of any resulting injury, while material to the question of damages and informative as to the likely degree of the force applied, is not in and of itself a threshold requirement for proving" an excessive force claim).

amount and type of force used, and a greater than *de minimis* use of force is required. "Even where the force is unjustified, 'not every push or shove violates the Constitution, but any use of force greater than *de minimis*, or any use of force that is 'repugnant to the conscience of mankind,' does." *Burt v. Nurse R.N.,* No. 4:19-CV-00040-SMR-CFB, 2019 WL 8752341, at *2 (S.D. Iowa Mar. 27, 2019) (citing *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008)).

The Court has carefully reviewed the video recordings of the handcuffing incident, and finds that the Defendants' version of what happened is corroborated by the video, while Rodgers' version of what happened is blatantly contradicted by the video. Importantly, defendants Reed and Nelson did not apply any force to Rodgers whatsoever. They were present during the incident but were not involved in handcuffing him or holding him down. Because Reed and Nelson did not apply force to Rodgers, they are entitled to judgment as a matter of law.

Rodgers correctly identified Allen as one of the officers who held him down and twisted his arm at one point. However, Rodgers' version of what happened is contradicted by the video recordings. First, Rodgers claimed his wrists were twisted for 7-8 minutes. While the entire incident lasted 11 minutes, Rodgers only complained about his wrists for a period of 2-3 minutes. He stood up and resisted directions to sit down at 10:19 but became compliant by 10:22 and stopped complaining about his wrists. There is no indication in the video recordings that

Rodgers was uncomfortable or experiencing pain at any other time during this incident. Further, the video shows that Rodgers was belligerent and refusing orders to sit down when Allen attempt to perform a wrist lock and twisted his arms. Accordingly, the video corroborates Allen's statement that he used force on Allen to gain control of him and prevent him from entering his cell while staff members searched it. Allen's actions did not constitute excessive force, but constituted a good faith effort to maintain and restore discipline.

Finally, there is no evidence that Rodgers suffered more than *de minimus* injuries during this incident. He alleged he suffered permanent scars and numbness as a result of the handcuffing incident, but his medical records do not show that he ever requested medical treatment for his wrists or complained of any injuries to them. The record contradicts Rodgers' claims of injuries and supports Allen's statement that he did not use an excessive amount of force, but only that reasonably necessary to bring Rodgers under control.

As stated above, if opposing parties tell two different stories, as is the case here, the Court is required to view genuinely disputed material facts in a light most favorable to the nonmoving party, **as long as** those facts are not so blatantly contradicted by the record that no reasonable jury could believe them. The Court finds that the facts alleged by Rodgers are so blatantly contradicted by the record that no reasonable jury could believe them. The Court is therefore not required to

view the facts in a light most favorable to Rodgers, and declines to adopt his version of the facts for purposes of ruling on this motion. *See Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017). The Defendants did not violate Rodgers' constitutional rights, and are therefore entitled to qualified immunity on Rodgers' excessive force claims.

### B.     *Official Capacity Claims*

Rodgers' official capacity claims also necessarily fail because he has not established that the Defendants are individually liable for an underlying substantive claim. *See Alexander v. Dallas Cty. Det. Ctr.,* No. 21-1397, 2021 WL 5121257, at *1 (8th Cir. Nov. 4, 2021); *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007) (holding that the County cannot be held liable under § 1983 if the individual defendants are not liable). Moreover, Rodgers has not alleged that the conditions he described were caused by an unconstitutional policy or custom of Pulaski County.[8]

---

[8] Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veach v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). Thus, a suit against a defendant in his official capacity is in essence a suit against the County or city itself. *See Murray v. Lene*, 595 F.3d 868 (8th Cir. 2010); *Liebe v. Norton*, 157 F.3d 574 (8th Cir. 1998). A municipality cannot be held liable on the basis of *respondeat superior*, or simply by virtue of being the employer of a tortfeasor. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201 (8th Cir. 2013). Accordingly, the Defendants, as county employees, can only be held liable in their official capacities in this case if Rodgers can establish that a constitutional violation was committed pursuant to "an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009).

## V. Conclusion

The Defendants' motion for summary judgment (Doc. No. 27) is granted. Judgment is awarded in favor of Defendants, and Rodgers' claims are dismissed with prejudice.

IT IS SO RECOMMENDED this 13th day of March, 2023.

_____
UNITED STATES MAGISTRATE JUDGE